**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| Harold Miner, individually and as a representative of a class of similarly situated persons, and on behalf of the T-MOBILE USA, INC. 401(K) RETIREMENT SAVINGS PLAN & TRUST,<br>PLAINTIFF,<br><br>v.<br><br>T-MOBILE USA, INC., THE BOARD OF DIRECTORS OF T-MOBILE USA, INC. AND ITS MEMBERS, THE T-MOBILE RETIREMENT PLANS COMMITTEE AND ITS MEMBERS, DOES 1-20, and DOES 21-40,<br>DEFENDANTS. | No.<br><br>**CLASS ACTION COMPLAINT** |

**COMPLAINT**

## I. INTRODUCTION

1. Plaintiff Harold Miner (the "Plaintiff") brings this action under 29 U.S.C. § 1132(a)(2) on behalf of the T-Mobile USA, Inc. 401(k) Retirement Savings Plan & Trust ("the Plan") and the Plan's participants and beneficiaries against the T-Mobile Defendants (defined below) for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA").

2. T-Mobile USA, Inc. ("T-Mobile"), the Board of Directors of T-Mobile (the "Board"), the T-Mobile Board of Directors' members, the T-Mobile Retirement Plans Committee (the "Committee" or the "Plan Committee"), and the T-Mobile Retirement Plans



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

Committee's members (collectively, "Defendants," "T-Mobile," or "T-Mobile Defendants") are the fiduciaries of the Plan who breached their fiduciary duties.

## II. OVERVIEW OF CLAIMS

### A. T. Rowe Price Growth Stock Trust's Underperformance

3. Defendants have retained in the Plan investment lineup an investment fund that is among the poorest performing of its kind: the T. Rowe Price Growth Stock Trust (the "Growth Stock Trust").

4. The Growth Stock Trust has been in the Plan since at least 2009. During those seventeen years, the Growth Stock Trust has been a persistent underperformer costing the Plan hundreds of millions of dollars in lost retirement savings.

5. Since 2009, the Growth Stock Trust has underperformed its designated investment benchmark, the Russell 1000 Growth Index (the "Russell Growth Index")[1] by 346 percentage points cumulatively (1,583% vs 1,237%).

6. The Growth Stock Trust generated far worse performance for over a decade relative to its designated benchmark and comparable funds available on the market on both a cumulative and annualized basis.

7. By at least December 31, 2020, any plan fiduciary, including Defendants, would and should have seen that the Growth Stock Trust had underperformed the Russell Growth Index over the preceding 1-, 3-, 5-, 7-, and 10- year periods.

8. In the five years leading up to the Class Period, between January 1, 2016, and December 31, 2020, prudent plan fiduciaries would and should have seen that the Growth Stock Trust underperformed the Russell Growth Index cumulatively by 17% (159% v. 142%), or on

[1] The Russell 1000 Growth Index is independently maintained by FTSE Russell, a wholly-owned subsidiary of the London Stock Exchange Group. FTSE Russell is a leading global provider of benchmarking, analytics, and data solutions for investors with over 30 years in the business. The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

average 1.66% each year. The Growth Stock Trust's underperformance during this 5-year period alone cost the Plan over $35,000,000 in lost retirement savings.

9. Annual underperformance of this magnitude is significant for both the Plan and its participants. During that five-year period a participant with $100,000 invested in the Growth Stock Trust would have fallen behind by $17,000 in their quest for retirement security relative to what they could have earned in a fund whose investment returns matched the Russell Growth Index.

10. To illustrate the effect of underperformance on the typical participant during their working years, a 35-year-old participant with $100,000 in retirement savings will see that amount grow to $761,000 by age 65, assuming a 7% return and no further contributions or withdrawals. However, that same $100,000 earning a lower investment return of 6.50% (or just 0.50% less) will grow to only $661,000, or $100,000 less.

11. The Growth Stock Trust's underperformance relative to the Russell Growth Index should have been deeply concerning to Defendants given that the aim of actively managed funds, like the Growth Stock Trust, is to outperform their designated benchmark.

12. The Growth Stock Trust's underperformance was even worse when compared to other funds that similarly invest in the largest companies with growth characteristics (the "Comparator Funds" described in Section VIII below).

13. The Growth Stock Trust's level of underperformance is almost impossible to make up. This is especially true since actively managed large cap stock funds compete in one of the most transparent and efficient markets. This leaves little room for actively managed large cap funds, like the Growth Stock Trust, to add value over the Rusell Growth Index.

14. Any prudent fiduciary exercising stewardship over the Plan would have a process in place to identify this magnitude of underperformance and promptly take corrective action. Statistically speaking, funds with this level of underperformance are more likely to continue to underperform. Any prudent fiduciary would not want to keep Plan participants' money invested in a fund with such chronic and pervasive underperformance.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

15. The Plan fiduciaries, though, have allowed the Growth Stock Trust to stay in the Plan investment lineup for well over a decade.

16. The Growth Stock Trust's underperformance worsened after the start of 2021. As shown in Section VIII, Tables 1.b. and 1.c, since the start of the Class Period on January 1, 2021, the Growth Stock Trust's cumulative performance fell over 46 percentage points (106% v. 60%) below the Russell Growth Index. On an annualized basis, the underperformance averages out to approximately 5.33%.

17. The Growth Stock Trust's underperformance during the Class Period was even worse when compared to the Comparator Funds. Underperformance since January 1, 2021, cost the Plan between $209,000,000 and $507,000,000 in lost retirement savings.

18. Retaining the Growth Stock Trust beyond December 31, 2020 has been disastrous for the Plan and its participants. During the Class Period, a participant with $100,000 invested in the Growth Stock Trust would have fallen behind by $49,000 in their retirement savings relative to what they could have earned in a fund whose investment returns matched the Russell Growth Index. For that participant saving for retirement these losses are all too real.

**B. Additional Indicia of Imprudence**

19. The chronic and severe underperformance of the Growth Stock Trust should have alerted any prudent fiduciary of the need to replace the fund with one of the readily available alternatives offering superior opportunities for gain within similar levels of risk. Beyond underperformance, though, Defendants ignored additional indicia of imprudence that should have alerted any fiduciary following a prudent process of the need to take action.

20. "Net flows" measure the amount of new assets being invested with funds (i.e., "inflows") relative to assets being transferred out of funds (i.e., "outflows" or "redemptions") irrespective of performance-based gains or losses. A fund with sustained outflows can signal that investors have lost confidence in the investment and decided to redeem shares and pull their money out.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

21. Over the last ten years, the Growth Stock Trust's mutual fund version, the T. Rowe Price Growth Stock Fund, has experienced a substantial outflow of assets from investors.[2] The T. Rowe Price Growth Stock Fund has experienced net redemptions in every one of the last ten years, even when including dividends reinvested by current shareholders

22. Between 2016 and the end of year filing on December 31, 2025, the T. Rowe Price Growth Stock Fund has seen a net decrease from capital share transactions of over $33 billion in assets. Divestment of this magnitude is significant and indicates investors' lack of faith in the investment strategy. Any prudent fiduciary adhering to a prudent fiduciary process would view this objective market indicator as a major red flag. Yet, Defendants continued to retain the Growth Stock Trust.

**C. ERISA's Plan-Wide Relief**

23. Had the T-Mobile Defendants been diligently monitoring the Plan as part of a prudent fiduciary process, they would have seen the multiple indicators that the Growth Stock Trust was no longer a prudent investment option for the Plan. They would have realized that the Growth Stock Trust's investment returns for the Plan relative to its designated benchmark and comparable funds with similar aims, risks, and potential rewards were indefensible. They would have realized that the market had lost confidence in the Growth Stock Trust's investment strategy. Yet the T-Mobile Defendants failed to take action to remove and replace the Growth Stock Trust. As a result, the Plan has suffered loss.

24. To remedy T-Mobile's breach of fiduciary duty, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce the T-Mobile Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty occurring during the Class Period. In addition, Plaintiff seeks such other Plan-wide equitable or remedial relief for the Plan as the Court may deem appropriate.

---

[2] The T. Rowe Price Growth Stock Fund is a publicly traded mutual fund that has the same investment strategy, is managed by the same people, and holds substantially the same stock as the non-public Growth Stock Trust.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

25. Plaintiff did not have knowledge of all material facts (including, among other things, comparisons of the Plan's investment performance relative to other available investment alternatives) necessary to understand that the T-Mobile Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before filing this Complaint. Further, Plaintiff does not have actual knowledge of the specifics of the T-Mobile Defendants' decision-making processes with respect to the Plan, including the T-Mobile Defendants' processes for monitoring and removing Plan investments, because this information is solely within the possession of the T-Mobile Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

## III. PARTIES

### A. Plaintiff

26. Plaintiff Harold Miner brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to 29 U.S.C. § 1132(a), seeking appropriate relief under 29 U.S.C § 1109 to protect the interests of the entire Plan. Plaintiff was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), and invested in the Growth Stock Trust during the Class Period. Plaintiff suffered individual injury in the form of diminished retirement savings by investing in the Growth Stock Trust during the Class Period.

### B. Defendants

27. Defendant T-Mobile USA, Inc. ("T-Mobile") is a wireless network carrier headquartered in Bellevue, Washington. T-Mobile is the Plan Sponsor.

28. T-Mobile acts through its Board of Directors. Defendant Board of Directors of T-Mobile is responsible for appointing and monitoring the T-Mobile Retirement Plans Committee (the "Committee").

29. The Committee is a fiduciary of the Plan. The Committee consists of certain employees of T-Mobile and administers the Plan from offices in Bellevue, Washington. Members of the Committee are appointed by the Board of Directors of T-Mobile. Current and



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

former members of the Committee are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercise discretionary authority and/or discretionary control respecting management of the Plan.

30. Plaintiff is currently unaware of the identities of the individual members of the Committee or any other committee that exercised discretionary authority during the Class Period. Accordingly, those individuals are collectively named Defendants Does 1-20. Further, Plaintiff is not currently aware of the identities of the members of the Board of Directors to whom the board delegated responsibility for the Committee and the Plan. Accordingly, those individuals are named Defendants Does 21-40. Plaintiff will substitute the real names of the Does when they become known to Plaintiff. To the extent that the Defendants delegated any of their fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to Plaintiff, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C. § 1002(21)(A) and thus alleged to be a Doe Defendant.

## IV. JURISDICTION, VENUE, AND STANDING

31. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

32. This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered and where at least one of the alleged breaches took place. It is also the District in which the T-Mobile Defendants reside and conduct business.

33. As a participant in the Plan and holder of the Growth Stock Trust, Plaintiff has standing to bring claims on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2), and he is a participant seeking appropriate Plan-wide relief under 29 U.S.C. § 1109. Thus, Plaintiff brings this suit under § 1132(a)(2) in a representative capacity on behalf of the Plan as a whole and seeks remedies under § 1109 to protect the Plan.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

34. Specifically, Plaintiff suffered individual injury in the form of diminished retirement savings by investing in the Growth Stock Trust during the Class Period. Defendants caused this loss by failing to (a) evaluate and monitor the Plan's investments on an ongoing basis; (b) eliminate imprudent investments; (c) take all necessary steps to ensure the Plan's assets were invested properly; and (d) investigate, evaluate, and monitor investments. These failures directly resulted in a Plan that included the Growth Stock Trust which suffered poor performance for well over a decade. Defendants failed to remove it within a reasonable time despite historical underperformance relative to its relevant benchmarks and comparator funds and despite a market indicator signaling serious problems. These were general practices that affected all Plan participants during the Class Period, including Plaintiff, who suffered harm in the form of diminished retirement savings as a result of these imprudent practices. The defects that made these general practices imprudent were thus of the same type that caused Plaintiff's individual injuries.

## V. ERISA'S FIDUCIARY STANDARDS

### A. Overview of ERISA's Fiduciary Duty of Prudence

35. ERISA's fiduciary duties are the highest known to the law. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities with the care, skill, prudence, and diligence of a prudent investment professional while focusing exclusively on the best interests of plan participants.

36. Even where participants choose their investments, plan fiduciaries must conduct their own ongoing independent evaluation to determine which investments may be prudently included and retained in the plan's menu of options.

37. As part of ERISA's duty of prudence, a fiduciary must determine whether a particular investment is reasonably designed, as part of the plan's menu, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

38. In addition to prudently selecting investment options, plan fiduciaries like T-Mobile Defendants have a continuing duty to monitor plan investment options and remove imprudent ones within a reasonable time. Plan fiduciaries must have a prudent investment evaluation process to make this determination. If an investment is imprudent, plan fiduciaries must dispose of it within a reasonable time.

### B. Fiduciary Liability Under ERISA

39. Under 29 U.S.C. § 1109, fiduciaries to the Plan are personally liable to make good to the Plan any harm caused by their breaches of fiduciary duty. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to *such plan* any losses to the plan resulting from each such breach, and to restore to *such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

40. 29 U.S.C. § 1132(a)(2) is the enforcement mechanism of 29 U.S.C. § 1109. It enables participants and beneficiaries to bring civil actions to seek appropriate relief under 29 U.S.C. § 1109.

### C. Co-Fiduciary Liability

41. ERISA provides for co-fiduciary liability where a fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty by a co-fiduciary if:

i. he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

ii. by his failure to comply with [29 U.S.C. § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

iii. he has knowledge of a breach by such other fiduciary, unless he makes reasonable



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

efforts under the circumstances to remedy the breach.

## VI. THE PLAN

42. The Plan is a profit-sharing plan as described in Section 401(k) of the Internal Revenue Code, I.R.C. § 401(k) (1986) and is subject to the provisions of ERISA. The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a). T-Mobile is the sponsor of the Plan.

43. The T-Mobile Defendants offer the Plan to T-Mobile employees as a means to save for retirement. The T-Mobile Defendants select a menu of investment options for the Plan and participants can only invest their retirement savings in the investment options that the T-Mobile Defendants select.

44. During the Class Period, the Plan provided for the retirement income of nearly 15,000 T-Mobile employees, former employees, and their beneficiaries (the "Plan participants"). Defendants exclusively controlled the selection and retention of the Plan's investment options, which includes both mutual funds and collective investment trusts.

45. Plan participants' retirement account balances primarily depended on contributions they made to their accounts, T-Mobile's matching contributions, and the performance (net of fees and expenses) of the Plan's investment options.

46. The Growth Stock Trust is one of the Plan's investment options selected by Defendants.

47. As of December 31, 2024, about $603,000,000 of the Plan's assets—around 7% of the Plan's total assets—had been allocated into the Growth Stock Trust.

## VII. OVERVIEW OF INVESTMENT FUNDS

48. An investment fund (such as a mutual fund, collective investment trust, or pooled separate account) is a pool of money contributed by a group of investors with similar investment objectives. The investment adviser firm hires a portfolio management team to invest the money in different stocks. The portfolio management team manages the investments in each fund in



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

accordance with the investment objectives and strategies set forth in each type of fund's investment guidelines.

49. For an actively managed fund, like the Growth Stock Trust, the fund's holdings are fluid. The portfolio management team continuously buys and sells securities in each fund in accordance with the investment objectives and strategies set forth in each fund's investment guidelines (e.g., large cap stock strategy).

50. The portfolio management team oversees the fund's asset allocation and investment strategy for which the fund charges an investment advisory fee.

**A. Active vs. Passive Management**

51. The Growth Stock Trust is an actively managed fund. Actively managed funds rely on the professional judgment of a portfolio management team to make decisions about the funds' portfolios of investments, such as which underlying funds to buy and sell, in what quantities, and when. The primary goal of an actively managed fund is to outperform a designated market benchmark—this is the objective for which investors are paying.

52. For the Growth Stock Trust, a large-cap portfolio management team decides the industries in which the fund will allocate assets, as well as what stocks to buy and sell and when. The Growth Stock Trust pays T. Rowe Price a fee for these services, a fee which the Growth Stock Trust passes on to investors, including the Plan's participants.

53. A fund's portfolio management team selects a benchmark—typically a market index—against which investors can evaluate and compare a fund's investment performance. These indexes are comprised of investments whose characteristics (i.e., market capitalization, risks, and potential rewards) match those investments that the fund's portfolio management team has identified for inclusion in the fund's portfolio. A benchmark in the investment world is akin to par in the professional golf world. The goal is to match or beat it.

54. The portfolio management team uses their professional judgment to select the benchmark which best represents the objective and strategy of the fund. Careful benchmark



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

analysis and selection by the portfolio management team is yet another feature of actively managed funds.

55. For the Growth Stock Trust, T. Rowe Price's primary focus should be to outperform its stated benchmark, the Russell 1000 Growth. Indeed, T. Rowe Price charges fees for active management on the premise that the Growth Stock Trust will consistently beat the Russell 1000 Growth.

56. Investment research and analysis typically drive the portfolio management team's investment decisions of actively managed funds. A fund's investment returns are dependent on these investment decisions.

57. Portfolio management teams make these decisions based primarily on a bottom-up analysis of financial data, such as a company's earnings, price to book value, price to earnings ratio, cash flows, and the like. Portfolio management teams may also consider market trends, perceived risk of investing in the company, industry and sector outlook, and the underlying stocks' performances in various market conditions.

58. Rather than acting solely on their own fundamental analysis of the data, some portfolio management teams may program that same financial data into an algorithmic model that interprets the data and generates potential buy and sell results. The portfolio management team then verifies the accuracy of the results and either buys or sells.

59. Based on their respective professional judgment, different portfolio management teams may come to different conclusions on the outlook for a certain company, industry, or market sector. At any given time one large-cap portfolio management team may find the healthcare industry promising and allocate more assets to large-cap healthcare stocks, while another may find the information technology sector promising and allocate more assets to large-cap information technology stocks, while a third may find financial services companies most promising and allocate more assets to large-cap stocks whose issuers focus on financial services. The specific assets within fund portfolios are very fluid; allocations to specific companies, industries, sectors, and regions are constantly changing due to investment decisions and



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

fluctuating market prices. Factors that a portfolio management team may consider include, but are not limited to, market trends, a company's financial condition, perceived risk of investing in the company, industry and sector outlook, and the underlying stocks' performances in various market conditions.

60. Portfolios are not static; allocations to specific companies, industries, sectors, and regions are constantly changing based due to investment decisions and changing asset valuations.

61. While funds may have similar investment objectives and strategies, their respective investment portfolios will not be the same. Without variations between portfolio holdings, all funds would own identical investment portfolios and have nearly identical investment performance.

62. Astute selection typically drives superior investment performance over time and distinguishes the better-performing funds from the underperforming ones. Bad asset allocation and poor investment selection and retention generally drive long-term underperformance.

63. Active managers run the risk that their methods and analyses, including models, tools, and data, may be flawed or incorrect and may not achieve the fund's aim. This could cause a fund to lag its chosen benchmark. Given that active managers are paid to beat their benchmark, chronic underperformance is a surefire indicator that investors are not getting their money's worth and should consider other investment options.

64. The variations driven by portfolio team judgment create opportunity costs. Because every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return. The Department of Labor has maintained this position on prudence for over 30 years. *See* Department of Labor Interpretive Bulletin 94-1 (June 23, 1994).

65. As mentioned below, the U.S. large-cap market has been particularly challenging for active managers due to its high transparency and efficiency, which leaves little room to add



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

value over the Russell 1000 Growth. Given these constraints, prudent fiduciaries need to carefully monitor the investment performance of the retirement plan's actively managed funds.

66. When an actively managed fund persistently underperforms its benchmark, a passively managed index fund – one that seeks merely to replicate the investment performance of a designated benchmark index – represents a viable option for prudent fiduciaries to consider. As Warren Buffett astutely observed, "If you invested in a very low-cost index fund—where you don't put the money in at one time, but average in over 10 years—you'll do better than 90% of people who start investing at the same time." Vanguard is a well-known leader in the passively managed fund space.

67. The portfolio management team of a passively managed fund draws from the same well of large-cap stocks. Therefore, when two funds share the same market-cap segment (e.g. large-cap), the same investment style box (e.g., a growth style), the portfolio holdings overlap, and the passive fund identifies the same index (e.g., Russell 1000 Growth), the comparison is not abstract active-versus-passive; it is a comparison for fiduciaries to evaluate whether the actively managed fund is justifying its higher fees.

**B. Investment Aims of Large-Cap Growth Funds**

68. The Growth Stock Trust is a large-cap growth fund. This means that from the various asset classes, it invests primarily in **stocks**. From the various categories of stock investments, it invests primarily in **large-cap stocks**. And from the pool of various large-cap stocks, it invests primarily in **large-cap stocks with growth style characteristics**.

69. Funds with a growth style invest in stocks of companies that are projected to grow faster than other stocks. Growth is defined based on fast growth (high growth rates for earnings, sales, book value, and cash flow) and high valuations (high price ratios and low dividend yields).

70. The principal aim of large-cap growth funds is to provide investors with long-term growth of capital. A fund's portfolio management team may adopt a certain investment style – growth, core, and blend. Funds with a growth style invest in stocks of companies that are projected to grow faster than other stocks. Growth is defined based on fast growth (high growth



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

rates for earnings, sales, book value, and cash flow) and high valuations (high price ratios and low dividend yields).

**C. Investment Risks of Large-Cap Growth Funds**

71. The principal categories of risks for large-cap growth funds like the Growth Stock Trust include market risk, issuer risk, and the risk of investing in growth-oriented stocks.

72. Market risk is the chance that stock prices overall will decline. Stock markets tend to move in cycles, with periods of rising prices and periods of falling prices, so each fund is subject to the risk that the market as a whole will fall.

73. Issuer risk is the chance that prices of, and the income generated by, individual securities of companies held by the fund (e.g., Starbucks) may decline in response to various factors directly related to the issuers of such securities, including reduced demand for an issuer's goods or services, poor management performance, major litigation, investigations, or other controversies related to the issuer.

74. Investing in growth-oriented stocks also carries risk. Such stocks (e.g., Microsoft) may experience larger price swings and greater potential for loss than other types of stocks, such as those that are considered value-oriented or those that historically have paid continuous dividends (e.g., Verizon).

75. Given the multitude of risks, market research suggests that most actively managed funds underperform their benchmarks. If a fund falls too far behind its benchmark, as here, it is unlikely that it will ever make up the poor investment performance. Therefore, keeping an actively managed fund that underperforms its benchmark over 3-year, 5-year, or longer periods is imprudent from a fiduciary perspective.

**D. Potential Investment Rewards of Actively Managed Large-Cap Growth Funds: Fiduciaries Select Benchmarks to Evaluate Achievement of Potential Rewards**

76. Investments are judged by investment performance. Typically, investors want a portfolio that consists of investments that meet or exceed their respective benchmarks. Whether



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

an investment performs well relative to its benchmark is concrete rather than abstract for an attentive fiduciary.

77. To facilitate a meaningful comparison, the fund's investment adviser selects a benchmark—typically a market index—that it considers to be representative of the fund's primary investment strategy. For example, T. Rowe Price determined the Growth Stock Trust is benchmarked to the Russell 1000 Growth, which is specifically tailored to large-cap stocks with a growth style. Investors rely on these benchmarks to evaluate and compare a fund's investment performance.

78. These indexes are comprised of investments whose characteristics (i.e., market capitalization, risks, and potential rewards) match those investments that the fund's portfolio management team has identified for inclusion in the fund's portfolio.

79. Typically, investors want a portfolio that consists of investments that meet or exceed their respective benchmarks. Whether an investment performs well relative to its benchmark is concrete.

## VIII. THE GROWTH STOCK TRUST AND ITS COMPARATOR FUNDS AND BENCHMARK

### T. Rowe Price Growth Stock Trust

80. The Growth Stock Trust's aim is to seek long-term growth of capital.

81. The Growth Stock Trust pursues its aim by normally investing at least 80% of its net assets in the common stocks of large-sized companies. Morningstar Inc. ("Morningstar")[3] identifies the Growth Stock Trust as a large cap growth fund.

[3] Morningstar, Inc. is a leading provider of independent investment research products (e.g., data and research insights on managed investment products, publicly listed companies, and private capital markets) for individual investors, financial advisors, asset managers, retirement plan providers and sponsors, and institutional investors in the private capital markets in North America, Europe, Australia, and Asia.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

82. As of June 30, 2026, approximately 94% of the Growth Stock Trust's portfolio is invested in large-cap stocks. Among its top holdings are stocks in NVIDIA, Apple, Microsoft, Amazon, and Broadcom.

83. The Growth Stock Trust's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth.

84. The Growth Stock Trust's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

85. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the Growth Stock Trust is considered by Morningstar as having a very aggressive risk profile.

86. The Growth Stock Trust is not the only large-cap growth fund on the market with the same mix of aims, risks, and potential rewards as described above. As shown below, numerous substantially similar funds have existed throughout the Class Period and before.

**Comparator 1: Fidelity Blue Chip Growth Commingled Pool**

87. The Fidelity Blue Chip Growth Commingled Pool (the "Fidelity Fund") has similar aims, risks, and potential rewards to those of the Growth Stock Trust.

88. Like the Growth Stock Trust, the Fidelity Fund is an actively managed large-cap growth fund.

89. Like the Growth Stock Trust, the Fidelity Fund's aim is to seek long-term growth of capital. Like the Growth Stock Trust, the Fidelity Fund pursues its aim by investing primarily in common stocks of large-sized companies.

90. As of June 30, 2026, approximately 85% of the Fidelity Fund's portfolio is invested in large-cap stocks. Like the Growth Stock Trust, the Fidelity Fund's top stock holdings include NVIDIA, Amazon, Apple, Microsoft, and Broadcom.

91. Like the Growth Stock Trust, the Fidelity Fund identifies the Russell 1000 Growth as one of its benchmarks.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

92. Like the Growth Stock Trust, the Fidelity Fund's potential reward is that the fund will generate positive investment returns that outperform the Russell 1000 Growth.

93. Like the Growth Stock Trust, the Fidelity Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

94. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the Fidelity Fund, like the Growth Stock Trust, is considered by Morningstar as having a very aggressive risk profile.

95. The aims, risks, and potential rewards of the Fidelity Fund are similar to those of the Growth Stock Trust given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth.

96. These characteristics make the Fidelity Fund a meaningful comparator to the Growth Stock Trust.

**Comparator 2: Alger Focus Equity Fund**

97. The Alger Focus Equity Fund (the "Alger Fund") has similar aims, risks, and potential rewards to those of the Growth Stock Trust.

98. Like the Growth Stock Trust, the Alger Fund is an actively managed large-cap growth fund.

99. Like the Growth Stock Trust, the Alger Fund's aim is to generate long-term growth of capital. Like the Growth Stock Trust, the Alger Fund pursues its aim by investing in common stocks of large-sized companies.

100. As of June 30, 2026, approximately 81% of the Alger Fund's portfolio was invested in large-cap stocks. Like the Growth Stock Trust, the Alger Fund's top stock holdings include NVIDIA, Amazon, Apple, Microsoft, and Broadcom.

101. Like the Growth Stock Trust, the Alger Fund identifies the Russell 1000 Growth as one of its benchmarks.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

102. Like the Growth Stock Trust, the Alger Fund's potential reward is that the fund will generate positive investment returns that outperform the Russell 1000 Growth.

103. Like the Growth Stock Trust, the Alger Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

104. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the Alger Fund, like the Growth Stock Trust, is considered by Morningstar as having a very aggressive risk profile.

105. The aims, risks, and potential rewards of the Alger Fund are similar to those of the Growth Stock Trust given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles. Moreover, both funds are actively managed investment options that are benchmarked to the Russell 1000 Growth.

106. These characteristics make the Alger Fund a meaningful comparator to the Growth Stock Trust.

**Comparator 3: Federated Hermes MDT Large Cap Growth Fund**

107. The Federated Hermes MDT Large Cap Growth Fund (the "Federated Fund") has similar aims, risks, and potential rewards to those of the Growth Stock Trust.

108. Like the Growth Stock Trust, the Federated Fund is an actively managed large-cap growth fund.

109. Like the Growth Stock Trust, the aim of the Federated Fund is to generate long-term growth of capital. Like the Growth Stock Trust, the Federated Fund pursues its aim by investing primarily in common stocks of large-sized companies.

110. As of June 30, 2026, approximately 78% of the Federated Fund's portfolio is invested in large-cap stocks. Like the Growth Stock Trust, the Federated Fund's top stock holdings include NVIDIA, Apple, Amazon, Microsoft, and Broadcom.

111. Like the Growth Stock Trust, the Federated Fund identifies the Russell 1000 Growth as one of its benchmarks.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

112. Like the Growth Stock Trust, the Federated Fund's potential reward is that the fund will generate positive investment returns that outperform the Russell 1000 Growth.

113. Like the Growth Stock Trust, the Federated Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

114. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the Federated Fund, like the Growth Stock Trust, is considered by Morningstar as having a very aggressive risk profile.

115. The aims, risks, and potential rewards of the Federated Fund are similar to those of the Growth Stock Trust given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles. Moreover, both funds are actively managed investment options that are benchmarked to the Russell 1000 Growth.

116. These characteristics make the Federated Fund a meaningful comparator to the Growth Stock Trust.

**Comparator 4: Vanguard Russell 1000 Growth Index Fund**

117. The Vanguard Russell 1000 Growth Index Fund (the "Vanguard Growth Fund") is a passively managed index fund that seeks to track the performance the Russell 1000 Growth. The Vanguard Growth Fund attempts to replicate the Russell 1000 Growth by investing its assets in the same large cap growth stocks as the Russell 1000 Growth.

118. As of June 30, 2026, approximately 86% of the Vanguard Growth Fund's portfolio is invested in large-cap stocks. Like the Growth Stock Trust, the Vanguard Growth Index's top stock holdings include NVIDIA, Microsoft, and Broadcom.

119. The Vanguard Growth Fund's potential reward is that it will generate investment returns in line with the Russell 1000 Growth.

120. The Vanguard Growth Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) investing in growth-oriented stocks.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

121. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the Vanguard Growth Fund, like the Growth Stock Trust, is considered as having a very aggressive risk profile.

122. By virtue of the similarities in their investment strategies, respective market capitalizations, and risk profiles, the Vanguard Growth Fund and the Growth Stock Trust share similar aims, rewards, and levels of risk.

123. The most telling difference between the Growth Stock Trust and the Vanguard Growth Fund relates to their fees and investment performance. As shown in the table below, the fees of the Growth Stock Trust are nearly six-times the fees of the Vanguard Growth Fund, yet, as illustrated in Section VIII below, the Vanguard Growth Fund has significantly outperformed the Growth Stock Trust since 2012.

| Fund Name | Fees |
|---|---|
| T. Rowe Price Growth Stock Trust Class E | 0.35% |
| The Vanguard Russell 1000 Growth Index | 0.06% |

124. The Vanguard Growth Fund tracks the performance of the Russell 1000 Growth and for a low fee. For a prudent fiduciary fed up with the high fees and poor performance of the actively managed Growth Stock Trust and wants to passively track the performance of the Russell Index, the economical Vanguard Growth Fund makes for a meaningful comparator.

**Comparator 5: Russell 1000 Growth Index**

125. The Russell 1000 Growth measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies that are similar to the companies included in the Growth Stock Trust, those with large capitalizations, relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

126. T. Rowe Price—the entity most knowledgeable about the Growth Stock Trust—discloses to the investing public that the Russell 1000 Growth is the "strategy benchmark" for the Growth Stock Trust (i.e., an index that closely aligns to the fund's investment strategy).

127. Therefore, the investment adviser of the Growth Stock Trust necessarily concludes that the Growth Stock Trust and the Russell 1000 Growth share similar investment characteristics.

128. The Growth Stock Trust and the Russell 1000 Growth share the same top stock holdings, including NVIDIA, Apple, Microsoft, Broadcom, Amazon, Tesla, Meta, Alphabet, and Eli Lily.

129. During the period that the plan participant is accumulating assets for retirement, the Russell 1000 Growth is an important tool which allows the fiduciaries to compare performance and assess whether the Growth Stock Trust's investment performance is keeping the participants on the right retirement track or causing them to fall behind.

130. The Russell 1000 Growth is one reliable tool a fiduciary can rely on to evaluate whether the investment adviser is doing what the Plan is paying it to do – beat the benchmark.

131. The Russell 1000 Growth also has an investable investment option. Investors can own the Russell 1000 Growth by investing in exchange-traded funds (ETFs) that own all or substantially all the stocks represented in the Russell 1000 Growth. Multiple reputable investment advisers such as Vanguard and Blackrock offer these ETFs.

132. By virtue of the similarities in their respective holdings and market capitalizations, the Russell 1000 Growth and the Growth Stock Trust share similar investment characteristics. This makes the Russell 1000 Growth a meaningful comparator.

## IX. THE GROWTH STOCK TRUST UNDERPERFORMED ITS BENCHMARK AND COMPARATOR FUNDS FOR OVER TEN YEARS

133. Poor investment performance can greatly diminish a participant's retirement savings and cause them to work many more years than they otherwise would. An investment



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

option that underperforms by a mere half a percent has a material impact on a participant's retirement savings and the overall Plan's investment return. *See infra* ¶ 10.

134. For a prudent fiduciary, investment options that, on average, underperform their benchmarks over three-year or five-year periods are generally candidates for removal. Such guidelines are often outlined in a plan's investment policy statement.

135. A prudent fiduciary would have realized that the underperforming Growth Stock Trust did not warrant the fees it was charging for active management. Even though the Growth Stock Trust sunk well below the Russell 1000 Growth, its fees were nearly six times the Vanguard Growth Fund's fees.

136. The severe underperformance illustrated in the tables below raises a plausible inference that the Growth Stock Trust could not be expected to provide higher investment returns than the Comparator Funds that had the same very aggressive risk profiles. Therefore, the Growth Stock Trust was not a prudent investment and its retention in the Plan was the product of an imprudent process.

**Growth Stock Trust Underperformance**

137. Had the T-Mobile Defendants fulfilled their duty with the care and skill of a prudent fiduciary, they would have seen just how poorly the Growth Stock Trust had performed historically by the start of the Class Period. Indeed, by December 31, 2020, the Growth Stock Trust had underperformed its benchmark, the Russell 1000 Growth, over the preceding one-year, three-year, five-year, and ten-year periods.

138. **Table 1.a** below illustrates the chronic cumulative and annualized underperformance of the Growth Stock Trust for over ten years, from January 1, 2016, to June 30, 2026.

139. **Table 1.a** reflects the growth of $312 million, which is the average amount of assets invested by Plan participants in the Growth Stock Trust from January 1, 2016, to June 30, 2026.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

140. The Growth Stock Trust underperformed significantly over this ten-year period compared to its Comparators and benchmarks. This data would have been available to the Defendants in real time to show the failings of the Growth Stock Trust in comparison to its peers.

**Table 1.a**
**January 1, 2016—June 30, 2026**

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $312 Million |
|---|---|---|---|
| T. Rowe Price Growth Stock Trust Class C[4] | 301.02% | 14.14% | $1.251 billion |
| Russell 1000 Growth TR | 457.24% | 17.77% | $1.739 billion |
| *+/- Growth Stock* | ***-156.22%*** | ***-3.63%*** | *-$488 million* |
| Fidelity Blue Chip Growth Commingled Pool Class F | 614.13% | 20.59% | $2.228 billion |
| *+/- Growth Stock* | ***-313.11%*** | ***-6.45%*** | *-$977 million* |
| Alger Focus Equity Y (ALGYX) | 652.62% | 21.19% | $2.348 billion |
| *+/- Growth Stock* | ***-351.60%*** | ***-7.05%*** | *-$1.097 billion* |
| Federated Hermes MDT Large Cap Growth R6 (QRLGX) | 488.90% | 18.40% | $1.837 billion |
| *+/- Growth Stock* | ***-187.88%*** | ***-4.26%*** | *-$586 million* |
| The Vanguard Russell 1000 Growth Index Fund | 458.04% | 17.79% | $1.741 billion |
| *+/- Growth Stock* | ***-157.02%*** | ***-3.65%*** | *-$490 million* |

| | |
|---|---|
| **Red** | **Underperformance between 0 and -20%** |
| **Dark Red** | **Underperformance between -20% and -50%** |
| **Black** | **Underperformance exceeding -50%** |

---

[4] In or around 2017, the Plan switched its T. Rowe Price Growth Stock Collective Investment Trust offering from the Class B shares to the Class C shares and again in 2021 from the Class C shares to the Class E shares. The investment teams, aims, risks, potential rewards, and portfolio holdings of each are substantially identical, the only meaningful difference being in fees. From the perspective of the Plan, the conversion among the share classes reflected a continuation of the same investment option. The annual and cumulative performance calculations shown in **Table 1.a** use the Class B performance data for 2016 through 2017, the Class C data for 2018 through 2020, and the Class E data for 2021 to the present. The annual and cumulative performance calculations shown in **Table 1.b** use the Class B performance data for 2016 through 2017 and the Class C data for 2018 through 2020. **Tables 1.c** and **1.d** use the Class E performance data.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

141. To contextualize the lost retirement savings caused by the Defendants keeping the underperforming Growth Stock Trust from January 1, 2016, to June 30, 2026, the individual participant in paragraph 10 who invested $100,000 in the Growth Stock Trust would have cumulatively made $400,638,68. By contrast, had the same participant had the Alger Focus fund as an option, they would have made $752,616.93 in the same time period. An individual participant lost out on over $350,000.00 in retirement savings in a ten-year period because the Defendants' faulty fiduciary process did not timely remove and replace the Growth Stock Trust.

142. In the year leading up to December 31, 2020, the Growth Stock Trust underperformed the Russell 1000 Growth by 1.97% (36.52% vs. 38.49%). This underperformance cost the Plan over $6,000,000.

143. Over the five years leading up to December 31, 2020, the Growth Stock Trust underperformed the Russell 1000 Growth by over 17%, or 1.66% annually (159.38% vs. 142.06%). This underperformance cost the plan over $35,000,000. The Growth Stock Trust simply could not compete.

144. The Growth Stock Trust also underperformed the Russell 1000 Growth over the 7- and 10-year periods leading up to December 31, 2020.

145. This level of underperformance should have been quite concerning to any plan fiduciary given that the aim of the Growth Stock Trust is to outperform the Russell Index.

146. **Tables 1.b, 1.c, and 1.d** below compare the investment performance of the Growth Stock Trust to the Russell 1000 Growth and the Comparator Funds. The Tables are like X-rays that expose the systemic underperformance that lies beneath.

147. In **Tables 1.b, 1.c, and 1.d** underperformance up to 5.0% is reflected in red, while underperformance greater than 5.0% is reflected in maroon.

148. **Table 1.b** reveals the underperformance of the Growth Stock Trust compared to the Russell 1000 Growth and to the Comparator Funds for the five-year period from January 1, 2016, through December 31, 2020.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

149. On average, during the period from January 1, 2016, through December 31, 2020, the assets of the Growth Stock Trust averaged around $204,000,000.

150. **Table 1.b** shows the investment growth of $204,000,000 invested in the Growth Stock Trust to the growth of $204,000,000 invested in the Russell 1000 Growth and each of the Comparator Funds from January 1, 2016, through December 31, 2020. As Table 1.b shows, in just that 5-year stretch the Growth Stock Trust lost the Plan upwards of $133,900,000 in retirement savings.

**Table 1.b**
**January 1, 2016—December 31, 2020**

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $204 Million |
|---|---|---|---|
| T. Rowe Price Growth Stock Trust Class C | 141.83% | 19.32% | $493.3 million |
| Russell 1000 Growth TR | 159.38% | 21.00% | $529.1 million |
| *+/- Growth Stock* | ***-17.55%*** | ***-1.68%*** | *-$35.8 million* |
| Fidelity Blue Chip Growth Commingled Pool Class F | 207.45% | 25.19% | $627.2 million |
| *+/- Growth Stock* | ***-65.62%*** | ***-5.87%*** | *-$133.9 million* |
| Alger Focus Equity Y (ALGYX) | 170.70% | 22.04% | $552.2 million |
| *+/- Growth Stock* | ***-28.87%*** | ***-2.72%*** | *-$58.9 million* |
| Federated Hermes MDT Large Cap Growth R6 (QRLGX) | 148.17% | 19.94% | $506.3 million |
| *+/- Growth Stock* | ***-6.34%*** | ***-0.62%*** | *-$13.0 million* |
| The Vanguard Russell 1000 Growth Index Fund | 159.58% | 21.02% | $529.5 million |
| *+/- Growth Stock* | ***-17.75%*** | ***-1.70%*** | *-$36.2 million* |

151. When viewed from a participant's perspective, annualized underperformance of 1.68% relative to the Russell 1000 Growth is significant. For a 35-year-old participant with $100,000 savings this 5-year annualized underperformance would have cost them over $17,000 and, if unabated, could diminish the participant's retirement savings by $287,000 over the course of their 30-year working career.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

152. Relative to the Fidelity Fund, the annualized underperformance of 5.87% cost this hypothetical participant $65,000 in retirement savings between January 1, 2016, and December 31, 2020.

153. These costs significantly impact a participant's opportunities and quality of life in retirement. The chronic underperformance also affects the timing of retirement and pushes workers to delay retirement to make up for lost money.

154. For a fund whose aim is to outperform the Russell 1000 Growth, the Growth Stock Trust failed. This deficiency made the Growth Stock Trust wholly unacceptable to the Plan.

155. Yet the Defendants did nothing. The Defendants kept the Growth Stock Trust despite objective, verifiable data showing the Plan made less money. Unsurprisingly, the Growth Stock Trust performed even worse throughout the Class Period.

156. Table 1.c. below illustrates the continued underperformance of the Growth Stock Trust from January 1, 2021, through June 30, 2026, on an annual and cumulative basis relative to the Russell 1000 Growth and the Comparator Funds.

157. The year 2023 was a relatively good year for the Growth Fund as it outperformed the Russell Index and four of the five Comparator Funds.

158. The year 2023 was but an isolated episode of good performance amidst a string of abysmal performance. The Growth Stock Trust suffered miserable performance in 2022 and 2024, wiping out any progress from 2023.

159. From January 1, 2021, through June 30, 2026, the Growth Stock Trust underperformed the Russell 1000 Growth cumulatively by over 49%.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

**Table 1.c**
**January 1, 2021—June 30, 2026**

| Fund | Annualized Performance | | | | | | Cumulative Compounded Performance |
|---|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2023 | 2024 | 2025 | June 30, 2026 | |
| T. Rowe Price Growth Stock Trust Class E | 19.44% | -39.53% | 46.78% | 30.17% | 15.87% | 3.71% | 65.83% |
| Russell 1000 Growth TR | 27.60% | -29.14% | 42.68% | 33.36% | 18.56% | 5.33% | 114.84% |
| *+/- Growth Stock* | ***-8.16%*** | ***-10.39%*** | *4.10%* | ***-3.19%*** | ***-2.69%*** | ***-1.62%*** | ***-49.01%*** |
| Fidelity Blue Chip Growth Commingled Pool Class F | 22.25% | -37.44% | 55.12% | 39.48% | 19.61% | 17.34% | 132.27% |
| *+/- Growth Stock* | ***-2.81%*** | ***-2.09%*** | ***-8.34%*** | ***-9.31%*** | ***-3.74%*** | ***-13.63%*** | ***-66.44%*** |
| Alger Focus Equity Fund Y (ALGYX) | 20.03% | -35.72% | 44.68% | 52.28% | 40.42% | 16.47% | 178.03% |
| *+/- Growth Stock* | ***-0.59%*** | ***-3.81%*** | *2.10%* | ***-22.11%*** | ***-24.55%*** | ***-12.76%*** | ***-112.20%*** |
| Federated Hermes MDT Large Cap Growth Fund R6 (QRLGX) | 30.38% | -24.69% | 39.62% | 36.26% | 18.48% | 7.22% | 137.29% |
| *+/- Growth Stock* | ***-10.94%*** | ***-14.84%*** | *7.16%* | ***-6.09%*** | ***-2.61%*** | ***-3.51%*** | ***-71.46%*** |
| The Vanguard Russell 1000 Growth Index Fund | 27.61% | -29.14% | 42.74% | 33.35% | 18.56% | 5.35% | 114.98% |
| *+/- Growth Stock* | ***-8.17%*** | ***-10.39%*** | *4.04%* | ***-3.18%*** | ***-2.69%*** | ***-1.64%*** | ***-49.15%*** |



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

160. Together, **Tables 1.b** and **1.c** capture the depth and the breadth of the Growth Stock Trust's underperformance relative to the Russell 1000 Growth that have persisted in the Plan for more than ten years.

161. All the data presented in each of the above **Tables 1.b** and **1.c** was available in real time to the T-Mobile Defendants as fiduciaries.

162. To extrapolate the Plan-wide impact of the Growth Stock Trust's underperformance, the starting point is the amount of money the Plan invests there. On average, during the period from January 1, 2021, through December 31, 2024, the Growth Stock Trust held approximately $453,000,000.

163. **Table 1.d** below compares the investment growth of $453,000,000 invested in the Growth Stock Trust to the growth of $453,000,000 invested in each of the Comparator Funds from January 1, 2021, through June 30, 2026.

164. As Table 1.d shows, the Plan has lost between $222,000,000 and $507,800,000 in retirement savings because the Defendants failed to safeguard the interests of the Plan by replacing the Growth Stock Trust with a prudent choice like the Comparator Funds. The five Comparator Funds listed in each of the Tables are managed by reputable investment advisers with significant assets under management and are available to all large retirement plans, including T-Mobile's Plan. T-Mobile would not have had to scour the market to find them.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

**Table 1.d**
**January 1, 2021—June 30, 2026**

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $453 Million |
|---|---|---|---|
| T. Rowe Price Growth Stock Trust Class E | 65.83% | 9.63% | $751.2 million |
| Russell 1000 Growth TR | 114.84% | 14.92% | $973.2 million |
| *+/- Growth Stock* | ***-49.01%*** | ***-5.29%*** | *-$222.0 million* |
| Fidelity Blue Chip Growth Commingled Pool Class F | 132.27% | 16.56% | $1.052 billion |
| *+/- Growth Stock* | ***-66.44%*** | ***-6.93%*** | *-$300.8 million* |
| Alger Focus Equity Fund Y (ALGYX) | 178.03% | 20.43% | $1.259 billion |
| *+/- Growth Stock* | ***-112.20%*** | ***-10.80%*** | *-$507.8 million* |
| Federated Hermes MDT Large Cap Growth Fund R6 (QRLGX) | 137.29% | 17.01% | $1.075 billion |
| *+/- Growth Stock* | ***-71.46%*** | ***-7.38%*** | *-$323.8 million* |
| The Vanguard Russell 1000 Growth Index Fund | 114.98% | 14.93% | $973.9 million |
| *+/- Growth Stock* | ***-49.15%*** | ***-5.30%*** | *-$222.7 million* |

165. For the 35-year-old participant with $100,000 in saving referenced in paragraph 10, this 5-year annualized underperformance would have cost them over $49,000 in lost retirement savings at retirement age.

166. Here, the Complaint paints a bleak picture of a fiduciary process marred by fiduciary inaction in the face of long-lasting poor investment performance. It underscores the disconnect between those workers desperately trying to navigate an intricate maze of saving for retirement and the duty-bound fiduciaries whose inactions fail to benefit the plan.

167. The T-Mobile Defendants, as fiduciaries bound by a duty of prudence, should have had a process in place to monitor and respond to the Growth Stock Trust's debilitating effect on the Plan's retirement savings.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

## X. CLASS ACTION ALLEGATIONS

168. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). Plaintiff brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to 29 U.S.C. § 1132(a), seeking appropriate Plan-wide relief under 29 U.S.C. § 1109 to protect the interests of the Plan.

169. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to a direct individual action on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiff may seek to certify this action as a class action on behalf of participants and beneficiaries of the Plan. Specifically, Plaintiff may seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Plan who invested in the Growth Stock Trust from January 1, 2021, through the date of judgment, excluding the T-Mobile Defendants, any of their directors, and any officers or employees of the T-Mobile Defendants with responsibility for the Plan's investment or administrative function.

170. This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

a. The Class includes thousands of members and is so large that joinder of all its members is impracticable.

b. There are numerous questions of law and fact common to this Class because the T-Mobile Defendants owed the same fiduciary duties to the Plan and to all participants and beneficiaries and took a common course of actions and omissions as alleged herein as to the Plan, and not as to any individual participant, that affected all Class members through their participation in the Plan in the same way. Thus, questions of law and fact common to the Class include, without limitation, the following: (i) whether each of the Defendants are fiduciaries liable for the



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

remedies provided by 29 U.S.C. § 1109(a); (ii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by employing an imprudent process for monitoring and evaluating Plan investment options; (iii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by retaining an imprudent investment for an unreasonable amount of time; (iv) whether Plaintiff's claims of an imprudent process require similar inquiries and proof of the claims, and therefore implicate the same set of concerns, for all proposed members of the Class; (v) what are the losses to the Plan resulting from each breach of fiduciary duty; and (vi) what Plan-wide equitable and other relief the Court should impose in light of the T-Mobile Defendants' breach of duties.

c. Plaintiff's claims are typical of the claims of the Class because Plaintiff was a Plan participant who invested in the Growth Stock Trust during the Class Period, and all participants in the Plan who invested in the Growth Stock Trust were harmed by the T-Mobile Defendants' misconduct.

d. Plaintiff is an adequate representative of the Class because they participated in the Plan during the Class Period, invested in the Growth Stock Trust, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged, experienced, and competent attorneys to represent the Class.

e. There are no substantial individualized questions of law or fact among Class members on the merits of this Action.

171. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the T-Mobile Defendants in respect to the discharge of their fiduciary duties to the Plan and their personal liability to the Plan under 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties, and remedies



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW

909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

172. Additionally, or in the alternative, certification under Rule 23(b)(2) may be appropriate because the T-Mobile Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Plaintiff may seek reformation of the Plan to include only prudent investments, which will benefit them and other Plan participants.

173. Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

174. Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including, but not limited to, the Defendants' liability to the Class for their allegedly imprudent conduct.

175. Alternatively, if Plaintiff is unable for any reason to proceed as class representatives under Rule 23, they remain adequate representatives of the Plan and of all absent Plan Participants. In that case, Plaintiffs may bring this action in their representative capacity as Plan Participants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Given the nature of the allegations, no Plan participant has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no particular difficulties likely to be encountered in the



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

management of this matter as a representative action. If proceeding in a non-class representative action, Plaintiff will act to institute procedural protections as necessary to protect the interests of all absent Plan participants.

176. Plaintiff's counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## XI. CAUSES OF ACTION

### COUNT I

### Breach of Duty of Prudence by Failing to Remove Imprudent Investments from the Plan Within a Reasonable Time

### (Violation of ERISA, 29 U.S.C. § 1104)

### (Against All T-Mobile Defendants)

177. All allegations set forth in the Complaint are realleged and incorporated herein by reference.

178. At all relevant times during the Class Period, the T-Mobile Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control with respect to the management of the Plan and its assets, and/or by rendering investment advice or by having authority or responsibility to render investment advice to the Plan, and/or were designated in the governing Plan documents as a named fiduciary within the meaning of 29 U.S.C. § 1102(a).

179. 29 U.S.C. § 1104(a)(1)(B) requires a plan fiduciary to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

180. Thus, under ERISA, the T-Mobile Defendants are responsible for evaluating and monitoring the Plan's investments on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure the Plan's assets are invested prudently.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

181. The T-Mobile Defendants breached their fiduciary duties through an imprudent process for investigating, evaluating, and monitoring investments. The faulty process resulted in a Plan which included funds that suffered poor performance and substantial redemptions, and charged relatively higher fees for well over a decade.

182. This process included the selection and retention of the Growth Stock Trust despite sustained poor relative investment performance and significant divestment.

183. T-Mobile Defendants failed to remove the Growth Stock Trust within a reasonable time despite historical underperformance relative to the Russell 1000 Growth and Comparator Funds.

184. By failing to replace the Growth Stock Trust with (a) a better-performing actively managed investment option, or (b) with a cheaper and better performing passively managed investment option (such as the Vanguard fund identified above), the T-Mobile Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

185. The T-Mobile Defendants' breach of fiduciary duty has substantially impaired the Plan's use, its value, and its investment performance for all Class members.

186. As a direct and proximate result of the T-Mobile Defendants' breaches of fiduciary duty, the Plan has suffered hundreds of millions of dollars of damages which continue to accrue and for which the T-Mobile Defendants are jointly and severally liable pursuant to 29 U.S.C. §§ 1132(a)(2) and 1109(a).

187. Each of the T-Mobile Defendants is liable to make good to the Plan any losses resulting from the aforementioned breaches and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. The T-Mobile Defendants are also subject to other Plan-wide equitable or remedial relief as appropriate, including an injunction and the removal of fiduciaries.



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

188. Each T-Mobile Defendant also participated in the breach of the other T-Mobile Defendants, knowing that such acts were a breach, and enabled the other T-Mobile Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties. Each T-Mobile Defendant knew of the breach by the other T-Mobile Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each T-Mobile Defendant is liable for any losses caused by the breach of its co-fiduciary duties under 29 U.S.C. § 1105(a).

**COUNT II**

**Failure to Monitor**

**(Against All T-Mobile Defendants)**

189. All allegations set forth in the Complaint are realleged and incorporated herein by reference.

190. The T-Mobile Defendants had a duty to monitor the performance of each party to whom they delegated any fiduciary responsibilities. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

191. To the extent any T-Mobile Defendants' fiduciary responsibilities were delegated to another fiduciary, the T-Mobile Defendants' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently, loyally, and in compliance with governing Plan documents.

192. The T-Mobile Defendants breached their fiduciary monitoring duties by, among other things:

a. failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' actions and omissions in violation of ERISA;

b. failing to monitor their appointees' fiduciary process;



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

c. failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that investment options were prudent; and

d. failing to remove appointees whose performance was inadequate in that they continued to allow investment options that were imprudent and otherwise violated ERISA to remain in the Plan, to the detriment of Plan participants' retirement savings.

193. Each fiduciary who delegated its fiduciary responsibilities likewise breached its fiduciary monitoring duty by, among other things:

a. failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' actions and omissions in violation of ERISA;

b. failing to monitor their appointees' fiduciary process;

c. failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that investment options were prudent; and

d. failing to remove appointees whose performance was inadequate in that they continued to allow investment options that were imprudent and otherwise violated ERISA to remain in the Plan, to the detriment of Plan participants' retirement savings.

194. As a direct result of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had T-Mobile and the other delegating fiduciaries discharged their fiduciary monitoring duties, the Plan would not have suffered these losses.

**PRAYER FOR RELIEF**

195. For these reasons, Plaintiff, on behalf of the T-Mobile USA, Inc. 401(k) Retirement Savings Plan & Trust and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

i. find and adjudge that the T-Mobile Defendants have breached their fiduciary duties, as described above;



PFAU COCHRAN VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

ii. find and adjudge that the T-Mobile Defendants are personally liable to make good to the Plan, any losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

iii. order the T-Mobile Defendants to make good to the Plan the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

iv. find and adjudge that the T-Mobile Defendants are liable to the Plan for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

v. determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

vi. order the T-Mobile Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

vii. impose surcharge against the T-Mobile Defendants and in favor of the Plan all amounts involved in any transactions or fiduciary breaches that were in violation of ERISA;

viii. reform the Plan to include only prudent investments;

ix. certify the Class, appoint the Plaintiff as a class representative, appoint Sanford Heisler Sharp McKnight, LLP as Class Counsel, and appoint Charles Field, Leigh Anne St. Charles, and Meghan Heesch as lead counsel for the Class;

x. award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

xi. order the T-Mobile Defendants to pay interest to the extent allowed by law; and

xii. grant such other equitable or remedial relief as the Court deems appropriate.



PFAU COCHRAN
VERTETIS AMALA
ATTORNEYS AT LAW
909 A Street, Suite 700
Tacoma, WA 98402
(253) 777-0799 | Fax: (253) 627-0654

DATED: July 31, 2026

Respectfully submitted,

**PFAU COCHRAN VERTETIS AMALA PLLC**

By: */s/ Thomas B. Vertetis*
THOMAS B. VERTETIS, WSBA No. 29805

By: */s/ Christopher E. Love*
CHRISTOPHER E. LOVE, WSBA No. 42832

909 A Street, Suite 700
Tacoma, Washington 98402
Telephone: (253) 777-0799
Facsimile: (206) 627-0654
tom@pcvalaw.com
chris@pcvalaw.com

**SANFORD HEISLER SHARP MCKNIGHT, LLP**

By: */s/ Charles Field*
CHARLES FIELD*, CA Bar No. 189817

By: */s/ Meghan Heesch*
MEGHAN HEESCH*, CA Bar No. 355708

7911 Herschel Avenue, Suite 300
La Jolla, CA, 92037
Telephone: (619) 577-4253
Facsimile: (619) 577-4250
cfield@sanfordheisler.com
mheesch@sanfordheisler.com

**SANFORD HEISLER SHARP MCKNIGHT, LLP**

By: */s/Leigh Anne St. Charles*
LEIGH ANNE ST. CHARLES*, TN Bar No. 036945

611 Commerce Street, Suite 3100
Nashville, TN 37203
Phone: (615) 434-7000
Facsimile: (615) 434-7020
lstcharles@sanfordheisler.com

**Pro Hac Vice Forthcoming*
*Attorneys for Plaintiff and the Proposed Class*